1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HERMAN YOUNG, | CASE NO. 2:24-cv-01277 |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| THE BOEING COMPANY, | |
| Defendant. | |

## 1. INTRODUCTION

Herman Young, an African-American man, worked as an Aircraft Test Technician at Boeing's Renton, Washington facility from 2018 until his termination in June 2023. Boeing terminated Young after its investigation found that he violated company policy by using a racial slur against a coworker. Young disputes Boeing's account of the incident and claims his termination was discriminatory.

Young brings claims under the Washington Law Against Discrimination for race discrimination, hostile work environment, and retaliation. He has abandoned his claims for age discrimination, disability discrimination, and failure to

accommodate. Boeing moves for summary judgment on all remaining claims. Dkt. No. 19.

Young's claims fail for distinct but related reasons. The undisputed evidence shows that Boeing uniformly terminated employees who committed the same policy violation, regardless of race. The conduct Young complains of does not rise to the level of a hostile work environment. And Young has not identified any protected activity causally linked to his termination. The Court GRANTS Boeing's motion and dismisses Young's case.

## 2. BACKGROUND

### 2.1 Young's Employment and the Troglia Conflict.

Herman Young, an African-American man, worked for Boeing as an Aircraft Test Technician at its Renton, Washington facility from about 2018 until his termination in June 2023. Dkt. No. 1-2 ¶¶ 1.1; 2.1. Young testified at his deposition that his experience at Boeing was marked by hostility from coworkers. *See* Dkt. No. 21-1. In 2021, a coworker called him "nigger." *Id.* at 48 (Young Tr. 139:2–4). Another coworker once threatened to "kick [his] fucking ass all the way out this plant." *Id.* at 51 (Young Tr. 142:4–10). Coworkers would have offensive discussions about race within his earshot. *Id.* at 52–54 (Young Tr. 143:11–145:5). Young never reported any of these incidents to Boeing management, Human Resources, or Boeing's Ethics hotline. *Id.* at 66, 74 (Young Tr. 163:2–25; 171:12–19).

In October 2022, Young's work circumstances changed. He suffered a left knee injury on the job and filed a workers' compensation claim. Dkt. No. 1-2 ¶¶ 2.6–

2.10. Boeing placed him on light duty status. *Id*. ¶ 2.10. A few months later, in February 2023, Ryan Troglia—another Aircraft Test Technician—joined Young's team, and conflict between them quickly followed.

According to Troglia—who identifies as "mixed race (Hispanic) and not 100% Caucasian"—Young became frustrated and called Troglia a "bitch ass nigger"[1] on February 24, 2023, while the two were working together. Dkt. No. 22-14 at 100. Troglia found Young's use of the racial slur "offensive" and it made him "uncomfortable." *Id*. Troglia told Young "don't call me that," but Young repeated the slur. *Id*. Troglia also reports that Young referred to white coworkers as "Crackers." *Id*. That same day, Troglia told his manager, Micheal Armstrong, that "there was some inappropriate conversation on the team, including foul language and inappropriate racial comments," though he did not identify who made the comments. *Id*. at 69.

Young tells a different story. Young denied calling Troglia the N-word, though his account would later change, as discussed below. Dkt. No. 22-14 at 15. He testified that Troglia harassed him from the start—mocking his work, calling him a "little bitch," and threatening to "get [him] fired." Dkt. No. 21-1 at 40–41 (Young Tr. 131:12–132:12). Young also claims that Troglia called him an "angry black man." Dkt. No. 22-14 at 15.

---

[1] Throughout this order, the Court uses the phrase "N-word" when speaking in its own voice. But when quoting the record, the Court reproduces the actual language used. Judicial opinions that euphemize the record risk obscuring the very conduct at issue. Where, as here, the use of a racial slur is central to an employer's termination decision and the plaintiff's claims, the Court declines to place a thumb on the scale by softening the language that drives the dispute.

On March 2, 2023, Young and Troglia had a confrontation while driving home from work, each accusing the other of aggressive driving. Dkt. No. 22-14 at 16, 101. The next day at work, on March 3, 2023, Troglia approached Young to discuss the prior day's run in. What was said is sharply disputed. Troglia reported that he asked Young, "Hey, you didn't know it was me until I rolled my window down, did you?" and that Young responded, "Man, I had my hand on my gun and almost shot your ass." *Id.* at 13. When Troglia told Young not to joke about that, Young allegedly said, "No man. You fuck with me outside of work and I'll fucking kill your ass." *Id.* Troglia reported these statements to Armstrong that same morning, stating he was concerned for his safety. Dkt. No. 24-8 at 2.

Young denies making any gun threats. He reported that Troglia approached him saying "Speed racer, speed racer," and that Young responded he had "been driving since [Troglia] was in diapers" and accused Troglia of "road rage." Dkt. No. 22-14 at 16. According to Young, it was Troglia who first mentioned a gun, asking, "What you going to do? Bring a gun and shoot me?" *Id.*

## 2.2    The Investigation and Termination.

Armstrong reported Troglia's complaints to Boeing's security and human resources and the Threat Management Team ("TMT"). *Id.* In response to the allegation that Young had a gun, Boeing security immediately searched Young's vehicle—no weapon was found. Dkt. No. 22-12 at 3. Young was escorted from the facility and his badge was confiscated pending an investigation. Dkt. No. 1-2 ¶ 2.28.

1    Three days later, on March 6, 2023, TMT formally determined that Young's

2  alleged conduct warranted investigation under the company's Threat Management

3  Policy. Dkt. No. 22-14 at 3. Young was suspended without pay pending completion

4  of the investigation. *Id*.

5    Boeing's Corporate Investigator Pam Steel interviewed witnesses and

6  collected documents. *Id*. at 2. Her resulting Report of Investigation ("ROI")

7  substantiated two policy violations: a "1B" violation for "Harassment (EEO—

8  Excluding Sexual)" based on Young's alleged use of the N-word, and a "1A" violation

9  for "Threats or Stalking" based on the alleged gun threats. *Id*. at 3–6. During the

10  investigation, Young denied using the N-word. He signed a written statement

11  providing: "I did not call Troglia a 'bitch ass nigger.' I told him to stop bothering

12  me." Dkt. No. 22-14 at 15. He also stated, "It is not true that I made the alleged

13  comments above." *Id*. at 16. Young did not tell Investigator Steel that he had used

14  the N-word in any context—self-referential or otherwise.

15    In May 2023, the ROI was forwarded to Boeing's Employee Corrective Action

16  Team, which evaluates substantiated policy violations under Boeing's Employee

17  Corrective Action Process Requirements ("ECAPR"). Dkt. No. 20 ¶¶ 2–3. Under the

18  ECAPR, a substantiated 1B harassment violation "usually results in discharge."

19  Dkt. No. 28 ¶ 6; Dkt. No. 20-1 at 9.

20    Charles Doyle, Director of Labor Relations, reviewed the ROI and Young's

21  personnel file. Dkt. No. 20 ¶¶ 3–5. Young's record reflected prior disciplinary

22  actions: a 2019 suspension for a physical confrontation with a coworker, a 2021

23  written warning for disruptive behavior, and a 2022 suspension for a safety

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 5

violation.[2] Dkt. No. 22-14 at 7. Doyle recommended discharge, and Vice President of Labor Relations Mike Fitzsimmons approved the recommendation. Dkt. No. 20 ¶¶ 5, 7. Both Doyle and Fitzsimmons knew nothing about Young's age, disability, or workers' compensation claim when making the decision. *Id*. ¶¶ 5, 9.

On June 5, 2023, Boeing terminated Young for the 1B harassment violation. Dkt. No. 22-17. Although the ROI substantiated both the 1B harassment violation and the 1A threats/stalking violation, Boeing terminated Young only for the 1B—the less contested of the two findings. *Id.*; Dkt. No. 20-4 at 2.

Young's account of his use of the N-word changed during this litigation. His Complaint included an altered version of his witness statement containing the admission, "I said I am not a bitch nigga." Dkt. No. 1-2 ¶ 2.30. At his deposition, Young confirmed he personally added this sentence to the document. Dkt. No. 21-1 at 87–88 (Young Tr. 212:16–213:8). Young now asserts that his use of the word was self-referential rather than directed at Troglia. Dkt. No. 23 at 7. But Young never sent this altered statement—or any version admitting N-word use—to Boeing *before* his termination. Dkt. No. 21 ¶¶ 3–9. Young's only email to Investigator Steel during the investigation (April 26, 2023) asked her to delete an unrelated phrase and did

---

[2] Specifically: (1) a written warning for "1E - Unacceptable/Disruptive Behavior or Communication on November 10, 2021, for using profanity"; (2) a suspension without pay for a "5F - High Hazard Safety, Health and Environment" violation on February 22, 2022, "for not following safety directions"; and (3) a suspension without pay for a "1D – Physical Confrontation on October 9, 2019, for putting his hands on a coworker and calling him 'Dead Beat Dad' and 'Asshole.'" Dkt. No. 22-14 at 7.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 6

not mention his now-claimed "context." Dkt. No. 22-13 at 3; Dkt. No. 21-1 at 82–83 (Young Tr. 201:10–23).

### 2.3    Procedural history.

Young sued Boeing in King County Superior Court on February 15, 2024, bringing claims under the Washington Law Against Discrimination for age and disability discrimination, retaliation, and for creating a hostile work environment on the bases of temporary disability, age, and race. Dkt. No. 1-2. Boeing removed the case to this Court. Boeing moved for summary judgment, and Young filed a timely opposition.

Well after his summary judgment response deadline, Young moved for leave to file a supplemental opposition to include so-called comparator evidence that Boeing produced after he filed his original opposition brief. Dkt. No. 30. The Court granted Young's motion, finding good cause to permit the late filing in the interest of resolving the case on its merits. Dkt. No. 44. Young's opposition papers do not address Boeing's arguments on his age discrimination, disability discrimination, or failure-to-accommodate claims. *See* Dkt. No. 23. The Court considers those claims waived and analyzes only Young's remaining claims for disparate treatment, hostile work environment, and retaliation below.

### 3.    DISCUSSION

### 3.1    Legal standard.

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

*Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (citation omitted). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "in the light most favorable to the non-moving party." *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019) (citation omitted).

In an employment discrimination case, the plaintiff "need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)). But even this forgiving standard does not excuse a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The nonmoving party may not rely on the mere allegations in the pleadings to show a "genuine issue for trial," but must instead "set forth specific facts[.]" *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005) (quoting *Liberty Lobby*, 477 U.S. at 256). This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). Thus, "summary judgment should be granted where the

nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

### 3.2    The Court denies in part and grants in part Boeing's motion to strike.

Boeing moves to strike Young's exhibits filed in support of his opposition, Dkt. Nos. 24, 25, on the ground that they are unauthenticated. Evidence presented at summary judgment must be admissible at trial. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). Even so, the evidence need not be presented in a form that would be admissible at trial—"[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). Authentication of an exhibit is a condition precedent to admissibility and is satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Unauthenticated documents should not be considered on a motion for summary judgment. *Orr*, 285 F.3d at 773.

The motion is denied as to exhibits that duplicate documents Boeing has already authenticated: Young's deposition excerpts (Dkt. Nos. 24-3, 24-4, 24-6), which correspond to Boeing's authenticated transcript (Dkt. No. 21-1); Young's investigative statement (Dkt. No. 24-5), authenticated by Boeing in Dkt. No. 22-14 at 14–17; and Young's termination notice (Dkt. No. 24-20), authenticated by Boeing

1  in Dkt. No. 22-17. The Court relies on Boeing's authenticated versions throughout

2  this Order. *See Orr*, 285 F.3d at 776 ("Once evidence offered against one party is

3  deemed authentic, its authenticity is established as against all other parties as

4  well.").

5      The motion is granted as to Dkt. Nos. 24-8, 24-19, 24-22, 24-23, and 24-24.

6  These exhibits—purported email correspondence, an internal policy manual

7  excerpt, and a personal statement prepared by Young—are not authenticated

8  merely by having been produced in discovery. *See Orr*, 285 F.3d at 773. Young offers

9  no declaration or other evidence from which to conclude these documents are what

10  they purport to be and he offers no explanation or evidence to show that these out-

11  of-court statements are not hearsay or that they fall within a hearsay exception.

12  The Court STRIKES these exhibits.

13  **3.3    Boeing is entitled to summary judgment on Young's WLAD disparate
14         treatment claim.**

15      Young's opposition to Boeing's motion for summary judgment mostly focuses

16  on arguments and evidence related to race discrimination. *See* Dkt. No. 23 at 9–10;

17  15–18. Boeing argues the Court should ignore these arguments because Young has

18  not pled a claim for race discrimination. Dkt. No. 26 at 11–13. Young's complaint

19  alleges age discrimination, disability discrimination, hostile work environment, and

20  retaliation, but he does not allege a discrete cause of action for race-based disparate

21  treatment. Dkt. No. 1-2. Nevertheless, because Young's opposition and

22  supplemental opposition focus substantially on race discrimination arguments, and

23  because the Court granted leave for Young to file supplemental briefing addressing

comparator evidence, the Court addresses these arguments. Dkt. No. 44. Even assuming Young had properly pled a race discrimination claim, he has not met his burden.

Disparate treatment claims under Title VII[3] and the WLAD are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4] *See Kastanis v. Educ. Emps. Credit Union,* 859 P.2d 26, 30 (Wash. 1993) (Washington courts "ha[ve] adopted the standard articulated by *McDonnell Douglas* in discrimination cases that arise out of RCW 49.60.180 and the common law.").

Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case by showing "(1) [they] belon[g] to a protected class, (2) [they were] performing according to [their] employer's legitimate expectations, (3) [they] suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the

---

[3] Young's complaint represents that he filed a charge with the EEOC and received a right-to-sue letter. Dkt. No. 1-2 at 3. The Court does not, however, construe his complaint to include a Title VII claim. Young originally filed this action in state court, and Boeing removed it to federal court on the basis of diversity jurisdiction. Dkt. No. 1. Because Title VII claims fall within the exclusive jurisdiction of the federal courts and cannot be brought in state court, Young's decision to file in state court suggests that he did not intend to pursue a Title VII claim. *But see Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 821 (1990) (federal courts do not have exclusive jurisdiction over civil actions brought under Title VII).

[4] "When a plaintiff opposing summary judgment presents direct evidence of a discriminatory motive, [Courts] do not assess the direct evidence in the burden-shifting framework set forth in *McDonnell Douglas*…. Direct evidence, which standing alone can defeat summary judgment, must be evidence directly tied to the adverse employment decision." *France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015). Because Young does not argue the presence of direct evidence, the Court utilizes the *McDonnell Douglas* burden shifting framework.

adverse employment action give rise to an inference of discrimination." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2017), *see also Subia v. Riveland,* 15 P.3d 658, 661 (Wash. Ct. App. 2001). If the plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981). The burden then returns to the plaintiff, who must show that the employer's proffered reason is pretextual—"either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang*, 225 F.3d at 1123–24 (quoting *Burdine*, 450 U.S. at 256).

### 3.3.1    Young states a prima facie case, but just barely.

The first three elements of Young's prima facie case are easily satisfied— Young is Black, Boeing does not dispute that he was meeting legitimate performance expectations, and termination is an adverse employment action. The fourth element is another matter. Young must show that similarly situated employees outside his protected class were treated more favorably, or that other circumstances give rise to an inference of discrimination. *Reynaga*, 847 F.3d at 691.

Young's principal evidence on this element is the comparator data submitted with his supplemental opposition. Dkt. Nos. 31, 39. Young analyzes ten other Boeing employees at the Renton location who were terminated for substantiated 1B violations involving use of the N-word. *See* Dkt. No. 31 at 5–9 (summarizing

1    Exhibits A through J). Young contends their conduct was "more egregious" than his,

2    involving repeated slurs directed at coworkers, racial epithets combined with other

3    offensive language, physical confrontations, and corroboration by multiple

4    witnesses, yet they received the same outcome—discharge. Dkt. No. 30 at 2. Young

5    argues this demonstrates Boeing's investigation of him was flawed because it failed

6    to address mitigating factors such as the allegedly "self-referential" nature of his

7    use of the N-word. *Id.*

8         Young's argument is self-defeating. Comparator evidence is meant to show

9    that similarly situated employees outside the plaintiff's protected class received

10   more favorable treatment. Here, the comparators received identical treatment—

11   they were all discharged, regardless of race. The Declaration of Cristin Kurtz,

12   Boeing's Employee Relations Specialist, confirms that "[a]t all times since July

13   2020, the level of discipline for substantiated '1B' violations has been 'usually

14   results in discharge.'" Dkt. No. 28 ¶ 6. Between July 2020 and now, all Boeing

15   employees at the Renton location who had substantiated complaints for using racial

16   slurs or derogatory race-based comments were discharged. *Id.* ¶¶ 7–9. "Not

17   including Plaintiff, for the period of July 2020 to present, there were ten employee

18   complaints for which Boeing confirmed use of the N-word by the respondent

19   employee. In all ten instances, the respondent employee's employment was

20   terminated for the substantiated category 1B violation involving the N-word." *Id.* ¶

21   9.

22        Critically, Kurtz establishes that among the ten discharged employees, "four

23   identified as White, three identified as Black/African American, one identified as

Asian, one identified as two or more races, and one identified as Native Hawaiian/Other Pacific Islander." Dkt. No. 28 ¶ 10. Young, who identifies as Black/African American, was treated the same as employees of every racial group—including three other Black employees who were also discharged for substantiated N-word violations. This is the opposite of disparate treatment.

On this record, the Court questions whether Young has established a prima facie case of discrimination. His own comparator evidence undermines the fourth element under *McDonnell Douglas* by demonstrating that similarly situated employees outside his protected class were not treated more favorably. But the burden of establishing a prima facie case "is not onerous." *Burdine*, 450 U.S. at 253. Because the Court's ultimate inquiry is whether Young has raised a genuine dispute as to pretext, the Court assumes that Young has stated a prima facie case and proceeds to analyze Boeing's proffered justification and whether Young has shown it to be pretextual.

### 3.3.2    Boeing has established a legitimate, nondiscriminatory reason for Young's termination.

Even assuming Young established a prima facie case for race discrimination, Boeing has articulated a legitimate, nondiscriminatory reason for Young's termination: his substantiated violation of the company's 1B harassment policy, which usually results in automatic discharge. Dkt. Nos. 28 ¶ 6; 20 ¶ 4. It is an undisputed fact that Boeing's reasons for discharging Young were also due to his prior disciplinary history, which included two suspensions and a written warning, his receipt of EEO training, and his relatively short tenure at Boeing. Dkt. No. 20 ¶

5. *See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 661 (9th Cir. 2002) (poor job performance qualifies as a legitimate, nondiscriminatory reason for termination). Boeing's investigation substantiated both a "1B" Boeing policy violation, "Harassment (EEO Excluding Sexual)," and a "1A" Boeing policy violation, "Threats or Stalking." Dkt. Nos. 22-14; 20-2. Although the ROI substantiated both violations, Boeing terminated Young only for the 1B—the less contested of the two findings. Dkt. Nos. 22-17; 20-4 at 2.

This showing satisfies Boeing's burden of production. *See Burdine*, 450 U.S. at 254–55 (employer's burden at the second step is one of production, not persuasion). The burden now shifts back to Young to demonstrate that Boeing's proffered reason is pretextual.

### 3.3.3    Young has not demonstrated pretext.

Young offers circumstantial evidence of pretext—such evidence must be "specific" and "substantial" to create a genuine issue of material fact. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir.1998). *See also Hooks v. Lockheed Martin Skunk Works*, 14 F. App'x 769 (9th Cir. 2001). Young advances several pretext arguments, none of which succeeds.

First, Young argues that Boeing "selectively enforced" its harassment policy against him while treating similarly situated employees outside his protected class more favorably. Dkt. No. 23 at 7–10. But the undisputed evidence defeats this theory. Boeing submitted a declaration from Cristin Kurtz, a Human Resources

1    Analyst, establishing that since July 2020, every employee at the Renton facility

2    who had a substantiated complaint for using the N-word was discharged. Dkt. No.

3    28 ¶¶ 7–9. This includes the ten comparators Young himself identified. *Id*. ¶ 10.

4    Those ten employees were not, as Young suggests, treated more leniently—they

5    were all terminated. *Id*. And they were racially diverse: four identified as White,

6    three as Black or African American, one as Asian, one as two or more races, and one

7    as Native Hawaiian or Pacific Islander. *Id*. Boeing enforced its policy uniformly

8    regardless of race. Far from establishing pretext, this evidence confirms that Young

9    was treated the same as every other employee who committed the same violation.

10          Second, Young argues that his use of the N-word was "self-referential" and

11   thus should have been treated more leniently. Dkt. No. 31 at 11. But this

12   characterization is contradicted by the record. Troglia reported that Young called

13   him a "bitch ass nigger" directly. Dkt. No. 22-14 at 100. Witness Michael Hoover

14   corroborated that Young "called Troglia a 'nigger' about two or three times" and

15   that "Troglia got pretty upset by this and told Young not to call him that." Dkt. No.

16   22-14 at 85. Young first denied using the word at all in his investigative statement.

17   *Id*. at 15. His account later changed, however, and he now admits using the word

18   but characterizes it differently. Even viewing the evidence in the light most

19   favorable to Young, there is a factual basis for Boeing's determination that he

20   directed a racial slur at a coworker in violation of company policy.

21          Third, Young argues that Boeing changed its stated reason for his

22   termination over time. Dkt. No. 23 at 15–16. He alleges that he was initially

23   informed he only committed a 1B violation, but then learned at his deposition that

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 16

his termination was due to both a "1B" and a "1A" violation. *Id*. Boeing has shown that it was consistent in evaluating Young for violations to both policies throughout the investigative process. The ROI and the emails between management about Young's termination all refer to both the "1B" violation and the "1A" violation. Dkt. Nos. 22-14; 20-2. Even assuming Boeing did not disclose or rely on the 1A violation in terminating Young, it is an undisputed fact that Young was terminated for violating the 1B harassment policy. Dkt. Nos. 28 ¶ 6; 20 ¶ 4; 20-1 at 9.

Fourth, Young argues that Boeing's investigation violated its own procedures by disregarding exculpatory evidence and crediting Troglia's account over his. Dkt. Nos. 23 at 19; 31 at 3–4. But this argument asks the Court to sit as a "super-personnel department" and second-guess Boeing's internal HR decisions. Courts "only require that an employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). Boeing's investigation interviewed multiple witnesses, reviewed documentary evidence, and reached conclusions supported by the record. Even if reasonable minds could differ on credibility determinations, that does not establish pretext.

Young's contention that Boeing should have weighed mitigating factors more favorably to him does not create a triable issue of pretext. The question is whether Boeing honestly believed Young violated the policy—not whether the Court would have reached the same disciplinary decision. Boeing's investigation substantiated that Young violated company policy by using the N-word. At least one witness corroborated Troglia's account. Young does not show that either a discriminatory

1  reason more likely motivated Boeing's decision or that Boeing's explanation is

2  unworthy of credence. *See Chuang*, 225 F.3d at 1123.

3          Young's disparate treatment claim falls short of what is required of him at

4  the summary judgment stage. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890–91

5  (9th Cir. 1994) (when evidence to refute the defendant's legitimate explanation is

6  totally lacking, summary judgment is appropriate even though plaintiff may have

7  established a minimal prima facie case based on a *McDonnell Douglas* type

8  presumption). The Court GRANTS Boeing summary judgment on Young's disparate

9  treatment claim.

10 **3.4    Boeing is entitled to summary judgment on Young's hostile work**
          **environment claim.**

11         Young's complaint asserts a hostile work environment claim on the bases of

12 his temporary disability, age, and race. Dkt. No. 1-2 ¶¶ 3.22–3.27. To succeed on a

13 hostile-work-environment claim, the plaintiff must show (1) that he was "subjected

14 to verbal or physical conduct because of" a protected characteristic, (2) that the

15 conduct was "unwelcome," and (3) that "the conduct was sufficiently severe or

16 pervasive to alter the conditions of [his] employment and create an abusive work

17 environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003)

18 (internal quotation marks omitted); *see Glasgow v. Georgia-Pac. Corp.*, 693 P.2d

19 708, 712 (Wash. 1985) (applying largely the same formula to WLAD claims). "'The

20 working environment must both subjectively and objectively be perceived as

21 abusive.'" *Id.* at 800 n.6 (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th

22 Cir. 2000)).

23

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 18

Courts must consider all the circumstances in determining whether an environment is hostile enough to violate the law, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 687 (9th Cir. 2017); *Blackburn v. State of Wash. Dep't of Soc. & Health Servs. & W. State Hosp.*, 375 P.3d 1076, 1082 n.4 (Wash. 2016). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005); *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000). To prevail on a hostile-work-environment claim, the plaintiff must show that the workplace was so "permeated with discriminatory intimidation, ridicule, and insult … that [it] is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation modified).

Young's claim fails under each of his three asserted bases.

### 3.4.1    Young identifies no harassment based on his age or disability.

Young concedes that no one in management commented on his age or disability. Dkt. No. 21-1 at 17, 38 (Young Tr. 102:16–22; 129:7–10). The only age-related comments Young identifies came from coworkers—Troglia once asked when he was going to retire, and another employee called him a "grouchy old man." *Id.* at 11–16 (Young Tr. 95:12–100:6). Young testified that he did not necessarily take

these comments as negative. *Id.* at 15 (Young Tr. 99:15–18). As for his disability, Young claims only that Troglia once said he was "faking" his knee injury. *Id.* at 30–33 (Young Tr. 121:24–124:11). These isolated remarks by coworkers, even if unwelcome, are not sufficiently severe or pervasive to constitute a hostile work environment. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 643–44 (9th Cir. 2003) (occasional, isolated remarks are not enough to create a hostile work environment).

### 3.4.2    Young's race-based hostile work environment claim also fails.

Young's race-based theory rests on two grounds: (1) harassment by his coworker Troglia, and (2) Boeing's response to Troglia's complaint, including the investigation and security walkout. Dkt. No. 23 at 20–21. Neither establishes a viable claim.

Young claims that Troglia harassed him—mocking his work, calling him names, and once calling him an "angry black man." Dkt. Nos. 22-14 at 15; 21-1 at 39–41 (Young Tr. 130:12–132:21). But Young concedes that Troglia never made any racial or racist comments to him. Dkt. No. 21-1 at 46 (Young Tr. 137:24–138). Young also testified that an unnamed coworker called him the n-word in 2021. *Id.* at 48–50 (Young Tr. 139:2–141:13). The Court does not minimize the gravity of such a slur. But Young provides few details about this incident—not even a name—and he does not remember reporting the incident to Boeing. *Id.* This vague and uncorroborated testimony, standing alone, is insufficient to create a triable issue. Moreover, an employer is liable for coworker harassment only if it knew or should have known of

1
2
3
4
5
6
7

the harassment and failed to take prompt corrective action. *Swinton v. Potomac Corp.*, 270 F.3d 794, 803–804 (9th Cir. 2001). It is undisputed that Young never reported Troglia's alleged conduct to Boeing management, Human Resources, or the Ethics hotline. Dkt. No. 21-1 at 66, 74, 81 (Young Tr. 163:2–25; 171:12–22; 182:10–16). Young knew he could report harassment to Boeing but chose not to. Because Boeing had no knowledge of Troglia's alleged harassment, it cannot be held liable for that conduct.

8
9
10
11
12
13
14
15

Young also contends that Boeing's handling of the investigation—the security escort, the search of his locker and car, and the investigator's alleged favoritism toward Troglia—amounted to racial harassment. Dkt. No. 23 at 20–21. He argues that the walkout and investigation into the alleged gun threat invoked racist tropes about Black criminality. *Id*. But Young offers no evidence that Boeing's actions were taken "because of" his race rather than in response to Troglia's complaint alleging a gun threat. Boeing investigated a complaint from one employee against another—a race-neutral response to a serious workplace allegation.

16
17
18
19

On this record, a reasonable juror could not find that Boeing created an objectively hostile work environment based on Young's disability status, age, or race. The Court GRANTS Boeing summary judgment on Young's hostile work environment claim.

20
21

### 3.5   Boeing is entitled to summary judgment on Young's retaliation claim.

22
23

Young asserts that Boeing terminated him in retaliation for engaging in protected activity. His complaint invokes the WLAD's protections against

retaliation for "lawful complaints against workplace discrimination." Dkt. No. 1-2 ¶ 3.29. In his opposition, Young contends that he "filed a grievance concurrently with the investigation that ensued after his locker was searched and his car was searched and no gun was found." Dkt. No. 23 at 21–22. At his deposition, however, Young offered a different theory—he testified that Boeing retaliated against him not for any discrimination complaint, but for "being injured on the job" and filing a workers' compensation claim. Dkt. No. 21-1 at 89 (Young Tr. 246:16–247:1). He expressly disclaimed that his termination was in retaliation for the general complaint he made to his former supervisor Kevin Francewar in 2021 about working conditions. *Id.* (Young Tr. 246:6–8). Young's retaliation theory has thus shifted over the course of this litigation, but under any formulation, it fails as a matter of law.

To establish a retaliation claim, plaintiffs must show that "(1) [they] engaged in a protected activity, (2) [they] suffered an adverse employment action, and (3) there was a causal link between [their] activity and the employment decision." *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065–66 (9th Cir. 2003) (citation omitted), *see also Graves v. Dep't of Game*, 887 P.2d 424, 427 (Wash. Ct. App. 1994).

Young has not established that he engaged in protected activity proximate to his termination. He concedes that the complaint he made to Francewar in 2021— roughly two years before his termination—was not the basis for Boeing's decision. He testified that, apart from that 2021 conversation, he never complained to Human Resources, Ethics, or any subsequent supervisor about discrimination or

harassment. The grievance he claims to have filed "concurrently" with the investigation is supported by nothing in the record—Young provides no documentation of such a grievance, no date on which it was filed, and no description of its contents. Dkt. No. 23 at 21–22. His deposition testimony contradicts rather than supports this claim. Vague assertions in an opposition brief, unsupported by admissible evidence, cannot defeat summary judgment.

To the extent Young now contends that his protected activity was filing a workers' compensation claim in October 2022, that theory fares no better. Even assuming such a claim constitutes protected activity under the WLAD, Young offers no evidence linking it to his termination eight months later. The only "evidence" Young cites is his own belief that Boeing wanted to "get rid of" him because he was "not being a 100 percent employee" while on light duty. Dkt. No. 21-1 at 89 (Young Tr. 246:19–247:1). But a plaintiff's subjective belief, without more, is insufficient to establish causation. Young points to no statements by decisionmakers, no temporal proximity between his workers' compensation claim and his termination, and no other circumstantial evidence from which a jury could infer retaliatory motive.

In fact, Director of Labor Relations Charles Doyle states that neither he nor Vice President of Labor Relations Mike Fitzsimmons—the decisionmakers—had knowledge of Young's age, disability, or workers' compensation claim when making the termination decision. Dkt. No. 20 ¶¶ 5, 9. A decisionmaker cannot act with retaliatory intent based on information unknown to them.

Young has failed to raise a genuine dispute that he engaged in protected activity or that any such activity was causally linked to his termination. The Court GRANTS Boeing summary judgment on Young's retaliation claim.

**3.6    Boeing is entitled to summary judgment on Young's disability and age discrimination claims and his failure-to-accommodate claim.**

Young did not respond to Boeing's motion for summary judgment on his disability and age discrimination claims. *See* Dkt. No. 23. The Court considers these claims abandoned. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir.2008) (plaintiff "abandoned...claims by not raising them in opposition to [defendant's] motion for summary judgment"). The same is true for Young's failure-to-accommodate claim, to the extent that he pled this claim in his complaint. Dkt. No. 1-2. Boeing is entitled to summary judgment on these claims.

## 4.  CONCLUSION

In sum, the Court GRANTS Boeing's motion for summary judgment and dismisses Young's case. Dkt. No. 19.

Dated this 23rd day of January, 2026.

Jamal N. Whitehead
United States District Judge